THE STATE v. J. D. WALLACE, Appellant.

Division Two, December 20, 1926.

**1. INFORMATION: Seduction.** An information charging that the appellant, "under and by virtue of a promise of marriage" by him made to a certain female, her, the said female, did "unlawfully and feloniously seduce and debauch," she, the said female, "being then and there an unmarried female of good repute and under twenty-one years of age," is sufficient in form and substance to support a verdict assessing his punishment at two years' imprisonment.

**2. SEDUCTION: Good Repute: Prior Birth of Child.** Notwithstanding an unmarried woman under twenty-one years of age had previously given birth to a child, as the result of a single act of sexual intercourse with her brother, as she testifies, she may still be a female of good repute; and where numerous witnesses testify that both before and subsequent to said unfortunate act, and at and prior to the time of her alleged seduction by appellant, her general reputation for chastity and virtue was good, and her only associates were virtuous and reputable girls, and the instructions require the jury to acquit defendant if she was not of good repute at the time of the alleged seduction, this court will not rule that she was not of good repute in the face of a verdict finding the appellant guilty.

**3. ———: Corroboration.** Testimony that appellant wrote the words "and wife" after his own name on the hotel register; that he wrote a telegram to prosecutrix's father stating they were married; that he told others that they were married; that he pointed out a house and said it was like the one in Chicago in which they would live; that, when asked if they were married, he stated he had papers in his pocket to prove they were, and that he telephoned to the Recorder's office for a marriage license, is substantial evidence to corroborate her testimony that he had previously asked her and she had promised to marry him.

**4. INSTRUCTIONS: No Objection at Trial.** Appellant is not entitled to assign error in the instructions when at the trial he interposed no objection to the sixteen given by the court and requested no others.

**5. ARGUMENT TO JURY: General Assignment.** An assignment, in the motion for a new trial, that the court erred in permitting the prosecuting attorney, in his argument to the jury, to go outside the record and appeal to the passions and prejudices of the jury, without specifying what were the words used or what actually occurred, or pointing out where in the

record the matters complained of may be found, is too indefinite, and furnishes no proper basis for review.

**6. NEWLY DISCOVERED EVIDENCE: Affidavits: After Appeal.** Affidavits setting forth newly discovered evidence, made after the case was tried, not mentioned in the motion for a new trial, not set out or called for in the bill of exceptions or in the transcript, but set out only in appellant's brief, are no part of the record, and cannot be considered for any purpose.

Corpus Juris-Cyc. References: **Criminal Law,** 16 C. J., Section 2291, p. 930, n. 93; p. 931, n. 96; 17 C. J., Section 3333, p. 64, n. 3; p. 65, n. 11; Section 3421, p. 135, n. 28; Section 3422, p. 137, n. 44; p. 138, n. 46; Section 3467, p. 178, n. 91; Section 3500, p. 190, n. 94. **Seduction,** 35 Cyc., p. 1341, n. 30; p. 1360, n. 71; p. 1361, n. 76; p. 1365, n. 93; p. 1366, n. 94.

Appeal from Douglas Circuit Court.—*Hon. Fred Stewart,* Judge.

AFFIRMED.

*Geo. T. Meador, J. L. Bess* and *J. D. Wallace* for appellant.

(1) The demurrer offered at the close of the State's testimony should have been sustained, as the prosecutrix's own testimony conclusively showed that she had wandered so far from the path of virtue before she ever met defendant as to render her seduction by him an impossibility. She had not only had a baby by her own brother some seven or eight months prior to the time of the alleged seduction, but was guilty of a felony under the laws of the State, and is under parole to the Missouri State Penitentiary. It was error to submit the case to the jury. State v. Drummins, 274 Mo. 632; State v. McFarland, 190 S. W. 8; State v. Stocker, 190 S. W. 294; State v. Patterson, 88 Mo. 88. The prosecutrix's own testimony shows that she was nothing more than a common prostitute willing to sell her person to any man on every occasion. In a case of seduction, it is immaterial whether a bad reputation is caused by imprudence or by crime, and by her own admissions she was guilty of both. Reputation means more than her reputation for virtue and chastity, and this woman had not trod the path of virtue since she was thirteen years of age. The Statute of Limitations had not run against the felony she had committed in this State. State v. Wheeler, 94 Mo. 252; State v. Geye, 299 Mo. 348; State v. Donnington, 246 Mo. 355. (a) The evidence considered as a whole does not constitute sufficient corroboration of any promise of marriage by the defendant and accepted by the prosecutrix, and is not sufficient to overcome the legal presumption of innocence and the testimony offered by the defendant. State v. Donnington, 246 Mo. 343; State v. Ben Bruton, 253 Mo. 361; State v. Thomas, 231 Mo. 41. The promise of marriage must be corroborated, and precede the seduction and be unconditional. An alleged promise of marriage not preceded by any courtship shows that

it was not made. The attempted corroboration of her testimony by Julia Kilbuck and Bertha Howard was not only inadmissible, but highly prejudicial to the defendant, and related to matters that occurred after the alleged seduction. No admission was ever made by the defendant to these witnesses that he had promised to marry this girl, and the statements that he did make to them were made under duress, under threats of immediate arrest. State v. Evans, 267 Mo. 175; State v. Reeves, 97 Mo. 677; State v. Thomas, 231 Mo. 41; State v. Eisenhour, 132 Mo. 140; State v. Wheeler, 108 Mo. 658; State v. Bruton, 253 Mo. 361; State v. Long, 257 Mo. 199. (b) The evidence of Margaret Joslin did not corroborate any promise of marriage, and according to the prosecutrix's own testimony the incidents referred to occurred prior to any alleged promise of marriage, and it was error for the court to have admitted her testimony. State v. Long, 257 Mo. 210; State v. Teeter, 239 Mo. 475; State v. Adams, 274 S. W. 21. (c) Where the State relies upon facts and circumstances to corroborate the prosecuting witness' testimony as to the promise of marriage, they should be such as attend an engagement of marriage: such as length of courtship, its duration, consistency, and certainly in this case, where the prosecuting witness admits she never saw the defendant but three or four times in her life, and the promise of marriage was not preceded by any courtship, the case should not have been submitted to the jury, nor the evidence offered by her in corroboration. State v. Wheeler, 108 Mo. 665; State v. Stocker, 190 S. W. 294. (d) The prosecuting witness admits that she is guilty of the crime of incest with her brother, and under the statute she was not a woman of good repute, and conviction should not be sustained. State v. Primm, 98 Mo. 368; State v. Wade, 268 S. W. 54.

*North T. Gentry,* Attorney-General, for respondent.

(1) The instructions fully covered the issues in the case, and very fairly presented the defendant's side to the jury. But even if the instructions were erroneous, defendant is in no position to complain as he did not save any exceptions to the giving of the instructions at the time. State v. Finley, 193 Mo. 211; State v. Kretschmar, 232 Mo. 43. (2) The evidence is sufficient. (a) In a seduction case where the evidence is conflicting, this court said: ''The weight to be given to it was for the jury, whose peculiar province it was to pass upon such matters, and this court will not interfere where there is substantial evidence to support the verdict.'' State v. Davis, 141 Mo. 526; State v. Babbitt, 270 S. W. 378; State v. Drummins, 274 Mo. 640; State v. Stokes, 288 Mo. 559; State v. Dent, 170 Mo. 403. (b) ''The authorities clearly show that, because a female may at some

period of her life have so forgotten her sphere, and self-respect, as to have yielded to temptation on one single occasion about which no one knows save and except herself and the other person engaged; she, by reason thereof, does not become of bad repute, entitled to no protection under the law, a prey to the lust of man, who, by reason of her misfortune, becomes licensed to deceive and betray her and find justification of his conduct, or immunity from punishment for his crime, because, forsooth, she had on some former occasion been guilty of illicit intercourse.'' State v. Dent, 170 Mo. 405; State v. Sharp, 132 Mo. 173; R. S. 1919, sec. 3259; State v. Thornton, 108 Mo. 651. (3) No error was committed in admitting in evidence statements made by defendant to the effect that he had promised to marry prosecutrix. State v. Whitworth, 126 Mo. 579. Statements made by a defendant in a seduction case to the effect that he had promised to marry prosecutrix are always admissible, and are sufficient corroboration of such promise. State v. Evans, 267 Mo. 187; State v. Sublett, 191 Mo. 170-3; State v. Einenhaur, 132 M̦o. 147; State v. Phillips, 185 Mo. 188; State v. Hill, 91 Mo. 423; Kenyon v. People, 26 N. Y. 203; Boyce v. People, 55 N. Y. 644; Armstrong v. People, 70 N. Y. 38; 3 Elliott on Evid., sec. 996; State v. Howard, 264 Mo. 393; State v. Sharp, 132 Mo. 165; State v. Marshall, 137 Mo. 463; 35 Cyc. 1363. (4) It is the duty of a defendant when newly discovered evidence is made the ground for a new trial, to assign the same in his motion for a new trial, and the same must be supported by the affidavits of the witnesses. State v. Smith, 247 S. W. 157; State v. Hewitt, 259 S. W. 781.

RAILEY, C.—On July 27, 1925, the Prosecuting Attorney of Greene County filed in the criminal court of said county, a verified information which, omitting formal parts, reads as follows:

"H. T. Lincoln, Prosecuting Attorney within and for the County of Greene, in the State of Missouri, under his oath of office informs the court that J. D. Wallace, late of the County and State aforesaid, on the 7th day of March, A. D. 1924, at the County of Greene and State of Missouri, did then and there under and by promise of marriage made to one Fern Staley by him, the said J. D. Wallace, unlawfully and feloniously seduce and debauch her, the said Fern Staley, she the said Fern Staley, being then and there an unmarried female of good repute and under the age of twenty-one years. Contrary to the form of the statute in such cases made and provided and against the peace and dignity of the State.''

On defendant's application, the venue was changed and the cause sent to the Circuit Court of Douglas County, where it was tried.

On September 25, 1925, defendant waived arraignment, entered a plea of not guilty, and entered upon the trial of said cause before a

jury. The latter, on the date aforesaid, returned the following verdict:

. "We, the Jury, find the defendant J. D. Wallace, guilty as charged in the Information and assess his punishment at two years in the State Prison Penitentiary."

Thereafter, defendant filed his motion for a new trial, which was overruled. He was thereupon granted allocution, judgment was rendered, sentence pronounced in conformity with said verdict and an appeal allowed him to this court.

The evidence on behalf of the State tends to show that defendant, a man fifty years of age and married, was the Prosecuting Attorney of Oregon County, Missouri. The date of the alleged crime was March 7, 1924, in Greene County, Missouri. The prosecuting witness, Fern Stanley, testified, in substance, that she was twenty years old and had lived most of her life near Koshkonong in Oregon County, but at the time of the commission of the alleged offense, she was living at the Y. W. C. A. in Springfield, Missouri, and attending a business college; that before coming to Springfield, she gave birth to a child, the father of whom was her brother; that during her confinement, she met defendant at her father's house; that he came there to interview her in regard to her brother's conduct; that her brother was sent to the penitentiary, and later defendant collected for her some money from her grandmother's estate in Illinois; that in February, 1924, defendant went to see her at Springfield in regard to the above estate; that defendant wrote her about getting her brother paroled, and she wrote defendant she would like to have him paroled; that defendant then telegraphed her to meet him at the 8:40 P. M. train on the evening of March 6, 1924, at the depot in Springfield; that he met her according to appointment, and rode with her in a yellow taxi to the Colonial Hotel in Springfield; that she and defendant sat in the parlor of said hotel and talked about the pardon; that in the conversation . defendant told her he and his wife were divorced; that she had lately done nothing but nag him, and they had divided their money equally; that she was living on the old home place and he was "now a free man;" that he asked her if she was going back to the Y. W. C. A. that night, and on being told she was, he told her it was late and on account of the business they were to transact the next morning, he would get her a room at the Colonial Hotel near his room; that after insistence on his part, she concluded to stay at the hotel until the next morning; that she did not register, but defendant registered for her and paid for her room, which was near the one occupied by him; that during the night defendant came to her room and asked admittance, but she declined to admit him; that on Thursday morning prosecutrix went to defendant's room in the Colonial Hotel, and defendant told her he would have to arrange for some letters about

her brother; that he dictated two letters to the Governor, which she took to the Y. W. C. A. to copy on the typewriter; that during the day defendant and one Margaret Joslin, with a taxi-cab and driver, took a ride around Springfield for about two hours; that during this ride he spoke of the home he would make for her and pointed out a house like the one they would live in when married; that it was a modern, up-to-date place with chickens in the yard, and he said, "We would have a chicken ranch;" that he also commented on different places he thought would be suitable for them to live in; that on the following day she took lunch with defendant at the Colonial Hotel; that after lunch, she and defendant, with one Hattie Herndon, went out for a ride; that defendant hired the car and drove it himself; that after riding until about three o'clock in the afternoon, the three took lunch, and the Herndon girl left them at the Y. W. C. A.; that she and defendant then went back to the parlor of the Colonial Hotel, and he asked her if she would marry him, and on her answering in the affirmative, he said he would go and get the license. Prosecutrix then went to the Y. W. C. A., and a little later defendant called her, said he had secured the license and would come for her; that defendant did come for her, said he had the license, and showed her a paper which he said was a marriage license; that she and defendant then went to the Sansone Hotel, in Springfield, as defendant said he had checked out at the Colonial, and would register a room at the Sansone; that at first they waited in the parlor for about half an hour for the minister, whom the defendant said would be there at eight o'clock; that they agreed they would be married at the Sansone Hotel, in Springfield, Greene County, Missouri; that after waiting for the minister to come, and he did not appear, defendant suggested that they go to his room and wait for the minister, which they did; that as they started, the hotel clerk called defendant and had a conversation with him, after which they went to defendant's room, and waited until eight o'clock for the minister, who did not come; that defendant said he supposed the minister had had car trouble, or something had happened; that defendant finally suggested they should retire for the night, and said in the morning, right after breakfast, they would be married; that he told her at the time he was a lawyer, a well educated man, knew his grounds, knew he was free, and there could be no harm in going to the room and staying that night together; that defendant assured her they would be married right after breakfast; that she consented, retired with him in that room and had sexual intercourse with defendant; that she yielded to him because of his assurance that they would be married next morning, and she thought she was as near to him as a wife could be; that the next morning she went to the Y. W. C. A., soon returned and had dinner with defendant; that while they were eat-

ing, Miss Julia Kilbuck and Miss Bertha Howard came in and spoke to him; that Miss Kilbuck was General Secretary, and Miss Howard, House Secretary of the Y. W. C. A.; that defendant was introduced to these ladies, and he asked them to join in the lunch, but they declined, and said they would wait until the lunch was over; 'that defendant then offered to go to the parlor of the hotel and talk things over with them; that Miss Kilbuck asked defendant if he and prosecutrix were married; that defendant produced a letter which he showed Miss Kilbuck and said he had a license and everything was all right; that the letter had reference to other matters; that at the instance of the defendant, they all four went to his room to talk privately; that while in his room, Miss Kilbuck again asked defendant if he and prosecutrix were married; that defendant pointed to the bed, saying they had slept in that bed the previous night, but not as man and wife; that defendant told them he had separated from his wife and intended to marry prosecutrix; that he loved her, and would do anything on earth rather than give her up; that he told Miss Kilbuck a common-law marriage in Missouri was legal; that Miss Kilbuck then questioned defendant, and threatened to send for the father of prosecutrix; that defendant agreed to this and said he would send the telegram; that a messenger boy was called with some blanks and defendant wrote the following, addressed to her father: "Fern and I were married last night;" that Miss Kilbuck did not approve of above, and defendant wrote another message as follows: "Miss Kilbuck does not believe we were married;" that Miss Kilbuck objected to this message, and he asked her to write one, which she did, as follows: "Come at once, Fern is in trouble;" that Miss Kilbuck signed this message and defendant paid for sending same and agreed to wait until her father came, when they would be married; that defendant insisted on having a Baptist minister to marry them; that all four of them went to see a room at the Y. W. C. A. in which they were to be married and to arrange for the minister to be there, as her father was expected there on the 8:40 train that evening; that accordingly Miss Kilbuck arranged for the minister to be present; that defendant said he would send up some flowers to decorate the room; that defendant then called the Recorder of Deeds, and asked that some one be in the office when the 8:40 train came, so a license could be obtained.

It appears from the evidence that the mother of prosecutrix was dead; that prosecutrix had finished the high school; that the trouble with her brother had resulted in the birth of a child, which was sent to the Fairmount Hospital at Kansas City, Missouri, and she had heard nothing more from it.

Prosecutrix testified that she had not kept company with other young men in Springfield, except when with a girl friend, while they

were simply riding around town; that her brother was sent to the penitentiary in July, 1923, and that two weeks before the trial of this case defendant filed in the Oregon Circuit Court a complaint, and had her arrested; that defendant expressed love for her while they were out riding with Margaret Joslin on Thursday afternoon and embraced her on that occasion.

The Deputy Recorder of Deeds of Greene County, Missouri, testified that on Saturday, March 8, 1924, he had a telephone call in regard to a license; that he told the party calling that the office would be closed at four o'clock on Saturday. He was then asked if a license could be obtained later, answered in the affirmative, and gave his street number.

Ira Beasley, clerk of the Sansone Hotel, testified that on the night of March 7, 1924, defendant registered at the hotel, after coming in with a lady, and wrote on the register, "J. B. Wallace;" that Beasley observed the lady, and when defendant started up the elevator with her, he called defendant's attention to the way he had registered, and asked if that was his wife with him; that defendant picked up the pen and wrote the words "and wife." The hotel register of Friday, March 7, 1924, was offered in evidence and disclosed the following: "J. B. Wallace and wife, Thayer, Room 215." Beasley said that some time later, defendant called and asked him if he could identify him (defendant). When answered in the affirmative, defendant asked him if he had ever stopped at this hotel. When the clerk seemed to identify him, defendant said, "I am the one J. B. Wallace claimed to have registered here March 7th." Defendant then asked to see the hotel register, which was shown him and he said: "This is J. B. Wallace and mine is J. D."

Miss Margaret Joslin, who also stayed at the Y. W. C. A. at Springfield, and was working at a printing office, testified that she knew prosecutrix and went riding with her and defendant on Friday, March 7, 1924; that they were driven around the city by a taxi-cab driver; that defendant pointed out a house, saying: "That is the kind of home we will have when we are married," and later he said to her, "We will build a house like that;" that defendant stated he was going to marry prosecutrix and that they were going to Chicago to live; that defendant suggested the ride, which lasted about one hour.

Miss Julia Kilbuck testified that she was a resident of Springfield, and had been General Secretary of the Y. W. C. A. for eight years, On March 8, 1924, she met defendant at the Sansone Coffee Shop in Springfield. He was in company of the prosecutrix, and Miss Kilbuck visited the coffee shop in company with Miss Bertha Howard. Miss Kilbuck walked up to the dining table where defendant and prosecutrix were taking lunch and introduced herself to him, saying

that she wanted to talk with him. Defendant asked her to wait until they were through lunch, and invited the two ladies to have lunch with them. Miss Kilbuck declined and demanded to know if defendant had married prosecutrix, and he replied, "I have the proof in my pocket." Miss Kilbuck told him if he would show the proof of the marriage, she would congratulate them and leave. Defendant then asked them to go to a more private place, so the four went to the lobby of the Sansone Hotel. The defendant said that this was not a very private place, and Miss Kilbuck told him that all that was necessary was for her to have proof. Defendant took a letter out of his pocket and handed it to her, but the letter was from a banker concerning some money matters, and had nothing to do with the alleged marriage. Defendant told them if they would go with him to his room he would make it plain, so the four went up to defendant's room. Defendant said, "Now, there is where I slept with that girl in that bed last night, but not as my wife." Then defendant raised his hand toward heaven and said, "In the sight of Almighty God, Fern is my wife, and we have done no wrong." Defendant said he loved prosecutrix and would rather jump out of the window and knock his brains out on the pavement than give her up; that they had been engaged for a long time and everything was all right. Defendant then said that he loved this girl and believed that they were all three honorable women and would keep the secret for a few days as he had reasons for keeping it a secret, and if it got out it would wreck him. After listening to his protestations of love for quite awhile, Miss Kilbuck suggested that the best thing to do was to wire for the father of prosecutrix to come, and defendant said: "That suits me. If he comes, it will make it all right; he will understand and will make you understand." Defendant then called for a telegraph messenger and wrote out the following telegram: "Fern and I were married last night." On objection from Miss Kilbuck, he tore the telegram up and wrote: "Miss Kilbuck does not believe Fern and I were married last night." As Miss Kilbuck insisted that was telling the same thing in different words, defendant asked her to write the message, so she dictated and defendant wrote: "Fern is in trouble, come at once." Defendant paid for sending the message and shook hands with Miss Kilbuck and asked her to be his friend and not give him away but keep the wedding a secret. Miss Kilbuck demanded that he either show her the marriage certificate or tell who performed the ceremony. Defendant turned to prosecutrix and said: "Fern, did we have a ceremony?" On receiving a negative answer, defendant said: "I am willing to marry her when and where you say." It was thereupon agreed to have the wedding at the Y. W. C. A. that evening, and defendant said he only wanted the four of them and the minister to be present and did not want any more publicity than possible.

Defendant said something about a common-law marriage. As to the marriage in the evening, Miss Kilbuck said: "It will give you six hours to make your get-away;" but defendant assured her that he was too permanent a man to make a get-away. The four then went to the Y. W. and defendant wanted to see the room in which they were to be married. When they got to the door, defendant put his arm around prosecutrix and had the soul kiss, saying: "Fern, you are my wife." After walking around the room, defendant said: "You ladies are forcing me to do things I do not want to do, and I am going to show you my cards; I separated from my wife on account of the love I have for this girl." On being asked if he were divorced, he said: "I gave my wife alimony half the property and the court has approved of our separation." Defendant insisted that prosecutrix was his wife and Miss Kilbuck asked if he meant common-law wife, and defendant said, "Yes, and that goes in Missouri, but not in Illinois." Defendant discussed with the three ladies about the wedding that was to be that night, and said that he wanted to have a Baptist minister to perform the ceremony because he was a Baptist. As they passed Stokes's Flower Shop defendant said: "I will send up some flowers and we will make the room look pretty." As Miss Kilbuck insisted that she was not interested in flowers, but was particularly anxious to have defendant come and be married, defendant said, "I know the punishment for bigamy, and I will be there sure and I will marry her and never leave her a minute." At the Y. W. defendant again professed his love for prosecutrix, and said nothing would ever separate them, and that in the sight of Almighty God she was his wife. After a good deal of this talk, prosecutrix commenced to cry and said she wanted her license. Miss Howard suggested that they go over to the Recorder's office, have the ceremony and have done with it right then. Defendant said the girl was not of age and he couldn't get the license, but to show them that he meant to do the right thing, he would have the Recorder be at the train after the girl's father came in that night. Miss Howard gave him the number of the Recorder's office, and defendant called the Recorder and asked him to have some one in the office to issue a marriage license after the train came in from Koshkonong that evening, and said that there would be two dollars extra in it if they would issue the license at that time of night. When defendant left prosecutrix at the Y. W. C. A., he again put his arm around her neck and gave her a kiss, promising to see her later when he brought her father from the train. By this time Miss Kilbuck was a little suspicious, so she offered to go to the station, but defendant said it would not be necessary. However, all three ladies decided that they would go to the station with defendant, who promised to come for them at 8:15. Defendant said: "I will see you all later and goodbye." As defend-

316 Mo.—6.

ant did not come for them, all three walked to the station to meet the father of prosecutrix. On the way they met defendant and another man. The ladies said: "You are the man we are looking for." Defendant said: "I was looking for you." Defendant asked them to ride to the station with him, and they agreed to go in a Yellow Taxi. Defendant walked by the taxi station, and when they called to him that he was passing the taxi station, he walked around the corner and that was the last they saw of him. During the conversations at the hotel, defendant shook hands with the ladies several times, saying that he wanted this matter kept a secret and hoped that they would help him to keep it a secret.

Miss Bertha Howard, the House Secretary of the Y. W. C. A., testified that on Saturday, March 7, 1924, she was present at the hotel with Miss Kilbuck, when they met and conversed with defendant and prosecutrix. She fully corroborated Miss Kilbuck as to all that occurred at the hotel and on the way to the depot.

The State proved by Miss Margaret Joslin and Miss Bertha Howard, both of Springfield, and J. T. McCormich, Rev. A. C. Roach, Mrs. F. H. Harrison, and A. W. Rice, all of Koshkonong, that they were well acquainted with prosecutrix and that her general reputation for virtue and morality up to March 7, 1924, was good.

The defendant introduced a number of witnesses who contradicted some of the testimony offered by the State, and thus raised an issue of fact for the jury.

W. O. Bockman, twenty-three years of age, testified, that he had sexual intercourse with prosecutrix while she was attending school at Springfield. The prosecutrix denied that any such thing occurred.

Defendant introduced several witnesses from Oregon County who testified that the general reputation of prosecutrix in said county for chastity and virtue was bad.

The defendant introduced a number of witnesses who testified that defendant's general reputation for being a law-abiding citizen was good.

Defendant testified in his own behalf, and denied that he ever made love to prosecutrix; denied that he ever promised to marry her or that he intended at any time to marry. He testified, that he had sexual intercourse with her at the hotel, but not under any promise of marriage. He admitted that he was out riding with Margaret Joslin and prosecutrix, but denied that he pointed out houses and said that was "the kind of home we are going to live in."

Other testimony was offered in behalf of the State as well as defendant, which we have not deemed necessary to set out.

We have mentioned the testimony of the State very fully, in order to determine whether there was sufficient evidence to take the case to the jury.

The instructions, rulings of the court and such other matters as may be deemed important will be considered in the opinion.

I.   The information herein is heretofore set out, and speaks for itself.   It is not challenged by motion to quash, by motion in arrest of judgment, nor in any other manner.   It is sufficient as **Information.** to both form and substance.   [Sec. 3259, R. S. 1919; State v. O'Keefe, 141 Mo. 272-3; State v. Mitchell, 229 Mo. 687-691; State v. Bowman, 213 S. W. 98; State v. Bobbitt, 270 S. W. 381.]

II.   At the conclusion of the case the defendant interposed a demurrer to the evidence, which was overruled.   We have heretofore set out an exhaustive statement of the State's case, **Demurrer** as presented to the jury, and will only refer in gen-**to Evidence.** eral terms to some of the prominent features of the testimony in considering this question.

It is undisputed that prosecutrix was under twenty-one years of age and was an unmarried woman on March 7, 1924.   It is true that in July, 1923, prosecutrix gave birth to a baby and that her brother was its father.   It is evident that the improper relation between prosecutrix and her brother must have taken place some time in the year 1922.   It is true that on the night of March 7, 1924, **Good** defendant had sexual intercourse with her, as she claims, **Repute.** under a promise of marriage, etc.   She testified that her brother never had sexual intercourse with her but the one time; that she never had sexual intercourse with any other person except defendant, and that he never had sexual intercourse with her prior to the evening of March 7, 1924, when they were engaged to be married. It was the province of the jury to pass upon the credibility of her evidence, in respect to above matter.   It appears from the testimony that she went to Springfield and commenced attending the business college there the latter part of December, 1923.   She roomed with Margaret Joslin at the Y. W. C. A.   Misses Howard and Kilbuck, officers of said institution, testified as to her general reputation for chastity and virtue while at Springfield, and other character witnesses were produced from Oregon County where she had formerly lived. On the facts heretofore set out, it was peculiarly the province of the jury to pass upon the issues as to whether prosecutrix, on the 7th day of March, 1924, was a female of good repute.   The instructions required the jury to acquit defendant if she was not of good repute at that time.

The remaining question presented under the demurrer to the evidence is whether or not there was sufficient corroboration of prosecutrix's testimony as to the alleged promise of marriage on March 7, 1924.   The facts relating to this matter are heretofore set out at great

length, and warranted the jury in finding that prose-
**Corroboration.**   cutrix was fully corroborated as to the promise of
marriage alleged to have been made on March 7, 1924, by clear and
substantial evidence. The promise of marriage was testified to by
Margaret Joslin, who was riding with defendant and prosecutrix
when she heard him say they were going to marry; that they were
going to Chicago to live and that he was going to build a certain
kind of a house for them to live in. Prosecutrix testified that on the
evening of March 7, 1924, while at the hotel, she and defendant
became engaged to be married and that a minister was expected to
come that evening and marry them. The evidence is clear that
defendant registered at this hotel as "J. B. Wallace." The clerk
of the hotel saw prosecutrix with appellant and as they started up to
his room to wait for the minister, the clerk called defendant's atten-
tion to the manner in which he had registered, and asked if the lady
with him was his wife. The defendant thereupon picked up a pen
and wrote after his own name the words, "and wife." Was not
this a strong corroborating circumstance tending to show a prior
engagement?

Pursuing this subject further, we find that Misses Howard and
Kilbuck, officers of the Y. W. C. A., were solicitous about the welfare
of prosecutrix and came to the above hotel, informed defendant that
they wanted to talk with him. He invited these two ladies to have
lunch with him and prosecutrix. Miss Kilbuck then asked him if he
and prosecutrix had married. He replied, "I have the proof in my
pocket." She told him if he would produce the proof of marriage,
she would congratulate them and leave. At the instance of defend-
ant they then went to his room and, after some conversation, he
raised his hand toward heaven and said: "In the sight of Almighty
God, Fern is my wife and we have done no wrong." According to
the testimony of these ladies he said he loved Fern; that they were
married the previous night and that he did not want to give her up.
After talking for some time, Miss Kilbuck suggested that the best
thing to do was to wire the father of prosecutrix to come. Defendant
acquiesced in that, called for a telegraph messenger and wrote out
the following telegram: "Fern and I were married last night."
Miss Kilbuck objected to this and defendant finally wrote a telegram
addressed to the father, saying, "Fern is in trouble, come at once."
Defendant paid for sending the message. After some further talk
he agreed to marry her and arrangements were made for the marriage
ceremony after the father arrived on the 8:40 P. M. train. He then
kissed Fern saying, "Fern, you are my wife." He called up the
Recorder's office and made arrangements for a license. The facts
are more fully set out in the preceding statement. In view of the
foregoing facts could there be any doubt in the minds of the jurors

as to defendant's promise to marry prosecutrix on the afternoon of March 7, 1924? We are of the opinion that the jury were fully justified in so finding, and that there was strong, substantial evidence tending to corroborate prosecutrix as to the promise of marriage made by defendant on the evening of March 7, 1924. [State v. Shiflett, 273 S. W. 728-9; State v. Bobbitt, 270 S. W. 378; State v. Stemmons, 275 Mo. 544, 205 S. W. 8; State v. Sublett, 191 Mo. 163; State v. Phillips, 185 Mo. 185; State v. Davis, 141 Mo. 522; State v. Sharp, 132 Mo. 165; State v. Hill, 91 Mo. 423.]

Upon a careful consideration of the foregoing contention of appellant, we have reached the conclusion that the trial court committed no error in overruling defendant's demurrer to the evidence and submitting the cause to the jury.

III. Appellant in his brief has not numbered the propositions discussed, but has run them altogether as though they constituted a single assignment of error. We find, however, at one place in his brief, he is criticising some of the instructions given in the case. An inspection of the transcript on file here discloses that defendant interposed no objection whatever to any of the sixteen

**Instructions.** instructions given by the court, nor does the transcript show that he requested any instructions aside from those given. He is in no position to assign error in respect to the instructions. We will say, however, in passing, that we never encountered more liberal instructions in any criminal case than those given by the trial court presenting defendant's side of the case. If any error was committed in respect to the instructions, it was against the State and not the defendant.

In order that the ruling of the court as to instructions can be the subject of review here, it would have to appear from the bill of exceptions, that the instructions complained of were objected to when given, and that an exception was noted, in the bill of exceptions, to the overruling of such objection.

The above assignment of error is accordingly overruled.

IV. The court is charged with error, in the motion for a new trial, in permitting counsel for the State in his closing argument to go outside the record and appeal to the prejudices and passions of

**Argument to Jury.** the jury. We are not advised in this assignment as to what actually occurred, nor where any of the matters complained of can be found. In considering the demurrer to the evidence we have examined the record carefully, and find nothing therein which would warrant us in disturbing the verdict in this case.

The above assignment of error is likewise overruled.

V. The defendant in his brief, has set out certain affidavits as to alleged newly discovered evidence which were executed after this case was tried in the court below. They are not mentioned in the motion for a new trial, nor are they called for or set out in the bill of exceptions or transcript on file here. They are no **Newly Discovered Evidence.** part of the record in this case and cannot be considered by this court for any purpose whatever. [State v. Baugh, 217 S. W. 280, and numerous cases cited; Kline Cloak & Coat Co. v. Morris, 240 S. W. 100, and cases cited; State v. Sanders, 252 S. W. 634; State v. Sadowski, 256 S. W. 755; State v. Smith, 256 S. W. 1027, and cases cited.]

VI. We have fully considered every phase of this case presented by the record, and find no error therein which would justify us in granting a new trial. The court in its rulings fully protected defendant in the admission and rejection of testimony. It was exceedingly liberal in the instructions presenting defendant's **Conclusion.** side of the case. We are of the opinion that defendant has received a fair and impartial trial before an unprejudiced jury; that he has been convicted upon substantial evidence, and that no error was committed during the progress of the trial of which he can legally complain. The judgment below is accordingly affirmed. *Higbee, C.,* concurs.

PER CURIAM:—The foregoing opinion of RAILEY, C., is adopted as the opinion of the court. *Walker* and *Blair, JJ.,* concur; *White, J.,* concurs in result and in all except Paragraph 3.